THE 1861 GROUP, L.L.C.,               )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )      No. 4:09CV435-DJS
                                      )
WILD OATS MARKETS, INC.,              )
                                      )
            Defendant.                )

## ORDER

Now before the Court is defendant Wild Oats Markets, Inc.'s motion for partial summary judgment [Doc. #31] directed to Count VII of plaintiff The 1861 Group, L.L.C.'s complaint. This matter has been fully briefed and is ready for disposition.

### Background

Plaintiff filed this landlord-tenant action in the Circuit Court of St. Louis County, Missouri on February 20, 2009, alleging numerous causes of action, including ejectment, trespass, conversion, breach of contract, negligence, and promissory estoppel. Defendant removed the action to this Court on March 18, 2009, invoking the Court's diversity jurisdiction. The lawsuit arises, in relevant part, out of a failed negotiation of a lease that would have expanded defendant's store in plaintiff's shopping center. Plaintiff alleges that defendant promised to enter into a lease after a good faith negotiation of its terms. Plaintiff further alleges that it relied on that promise in expending large

sums of money. Plaintiff's promissory estoppel action seeks to recover those sums. After a period of discovery, defendants have filed for summary judgment on plaintiff's promissory estoppel action.

## Standard of Review

In considering a motion for summary judgment, the Court will "view all of the evidence in the light most favorable to the nonmoving party and [will] give that party the benefit of all reasonable inferences to be drawn from the facts disclosed in the pleadings." Reich v. ConAgra, Inc., 987 F.2d 1357, 1359 (8th Cir. 1993). "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id. "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1326 (8th Cir. 1995).

## Facts

The following facts are those that are undisputed for purposes of this motion, including those facts from defendant's statement of uncontroverted facts that are deemed admitted because plaintiff failed to controvert them with competent evidence. See E.D.Mo. L.R. 4.01. To the extent the facts are in dispute, the following statement of the facts accepts plaintiff's version as true.

Plaintiff is the owner of a shopping center, Lammert Center, located at 8801-8845 Ladue Road, St. Louis, Missouri. Defendant, a natural and organic foods supermarket, became a tenant at Lammert Center in May 1996. Defendant's tenancy at Lammert Center was pursuant to the terms of a sublease with Schnuck Markets, Inc. ("Sublease"). Schnuck Markets received an assignment of the prime lease from the original tenant, National Super Markets, Inc., who had entered into the prime lease with plaintiff for the premises on October 16, 1992 ("Lease").

In early 2000, defendant became aware that its primary competitor, Whole Foods Market, planned to build a new store in St. Louis in a competitive location to defendant's store at Lammert Center. Defendant expected that the new Whole Foods store would be larger than defendant's store at Lammert Center, so defendant began considering expansion so the store could better compete with the new Whole Foods store.

Ronald Feldman, defendant's vice-president of real estate, was tasked with approaching plaintiff in order to explore the possibility of obtaining more space in Lammert Center. In early 2000, Feldman contacted plaintiff and inquired about the possibility of defendant obtaining additional space adjacent to the lease premises, and Feldman began negotiating with Richard Lammert, who acted as plaintiff's representative. At the outset of their discussions, Feldman advised Lammert that time was of the essence because defendant wanted to finish the proposed expansion of its

store before the new Whole Foods store opened, which defendant expected would be in the fall of 2001. Because defendant and plaintiff had no direct contractual relationship, negotiations between Feldman and Lammert centered on the idea of obtaining a termination of the Lease and Sublease, and plaintiff and defendant then entering into a direct lease that included both the existing space and additional expansion space. In order to make the expansion space available, plaintiff would need to relocate or terminate the tenancy of three Lammert Center tenants, namely Prints Charming, Greeting Galleries, and Northwest Coffee. Lammert informed Feldman that, in order to ensure that the expansion could take place in the time frame contemplated by defendant, plaintiff would need to move those three tenants out of their current spaces while the negotiations for the new lease were ongoing. Feldman asked for and received from Lammert frequent updates regarding the status of plaintiff's efforts to move the other three tenants.

Plaintiff and defendant engaged in negotiations for a direct lease from early 2000 until April 2001. On July 19, 2000, defendant sent plaintiff a proposed letter of intent relating to the expansion of its store at Lammert Center. The letter of intent was sent in order to set forth the basic parameters of a deal that would be acceptable to defendant, noting that those terms would have to be memorialized in a signed lease before they would be binding on either party. Specifically, the last paragraph of the letter stated in all capital letters: "LANDLORD AND TENANT

4

ACKNOWLEDGE THAT THIS PROPOSAL IS NOT A LEASE, AND THAT IT IS INTENDED AS THE BASIS FOR THE PREPARATION OF A LEASE.  THE LEASE SHALL BE SUBJECT TO LANDLORD'S AND TENANT'S APPROVAL, AND ONLY A FULLY EXECUTED LEASE SHALL CONSTITUTE A BINDING LEASE FOR THE PREMISES."  Another paragraph in the letter, entitled "Expiration of Proposal" stated:

> This proposal shall remain in force for 7 days from the Tenant's date of this proposal.  Landlord agrees not to discuss or negotiate toward leasing the Premises to anyone other than Tenant for 60 days after landlord approves this Letter of Intent.  The parties will use good faith efforts to execute a lease consistent with this Proposal within said 60 day period.

Plaintiff never accepted or signed defendant's July 19, 2000, letter of intent because the terms were not completely acceptable to plaintiff.

On July 24, 2000, plaintiff sent a proposed lease created with plaintiff's standard lease form, which contained terms that were different from the terms that defendant had proposed in the July 19, 2000, letter of intent.  On July 26, 2000, plaintiff responded to defendant's letter of intent by marking the letter with Lammert's handwritten comments and objections and faxing the marked-up version back to Feldman.  Plaintiff's marked-up version revised the "Expiration of Proposal" provision to 15 days, in both instances in which 60 days were called for in defendant's letter. Defendant did not sign plaintiff's July 26 version of the letter of intent.

In August 2000, Lammert began negotiations with Prints

Charming regarding relocating them to a new space in the shopping center.  Through the negotiations with Prints Charming, Lammert learned that they would require plaintiff to, among other things, pay for their moving expenses, pay to build a new space in the shopping center, and agree to a reduction in rent in order to accomplish the move.  While these negotiations were ongoing, Lammert contacted Feldman and informed him of the significant expenses that plaintiff would incur as part of a deal to move Prints Charming.  Lammert expressed concern regarding these expenses.  Feldman responded that there was no reason for concern, that defendant would enter into a lease with plaintiff, and that plaintiff should proceed immediately with moving Prints Charming. Based on those statements, plaintiff closed the deal with Prints Charming and had them moved by January 1, 2001.

On August 24, 2000, plaintiff sent defendant a revised letter of intent.  The last paragraph of the letter stated in all capital letters:

> LESSOR AND LESSEE ACKNOWLEDGE THAT THIS LETTER OF INTENT
> IS NOT A LEASE, AND THAT IT IS INTENDED AS THE BASIS FOR
> THE PREPARATION OF THE SCHNUCK'S ASSIGNMENT AGREEMENT,
> THE NATIONAL TERMINATION AGREEMENT AND THE NEW LEASE.
> THESE THREE DOCUMENTS SHALL BE SUBJECT TO LESSOR'S AND
> LESSEE'S APPROVAL, AND ONLY FULLY EXECUTED DOCUMENTS
> SHALL CONSTITUTE A BINDING AGREEMENT FOR THE PREMISES.
> THE TERMS AND CONDITIONS OF THIS LETTER OF INTENT ARE
> NON-BINDING.

During August and September of 2000, plaintiff and defendant continued to negotiate over the proposed expansion.  The parties were able to reach agreement on some terms, including

monthly rent, but there were numerous other lease issues which remained in dispute and required further negotiation before defendant could commit to expanding its Lammert Center store. In September 2000, Freya Brier, defendant's vice-president and general counsel, drafted a proposed lease, which included terms the parties had agreed upon and also documented defendant's position on issues that the parties had not yet agreed upon. The proposed lease was based upon defendant's standard lease form, which defendant required be used. She sent the draft lease to Joe Hipskind, an attorney for plaintiff at the Armstrong Teasdale law firm who was hired to work with defendant to negotiate and document a lease to replace the Lease and Sublease. On October 13, 2000, Brier re-sent the same draft lease to Mark Murray, another Armstrong Teasdale attorney representing plaintiff.

In September 2000, while the above communications between Brier and plaintiff's attorneys were on-going, Lammert was in discussions with Greeting Galleries regarding the termination of its lease. In order to terminate the lease, plaintiff was required to forgive debts owed by Greeting Galleries, as well as lose the right to future rents under the existing lease. Lammert contacted Feldman to provide an update regarding the status of the moves. During that conversation, Lammert was informed that plaintiff should proceed with moving the tenants because defendant was continuing to negotiate the deal for the additional space. Based on this conversation, Lammert proceeded to work with Greeting

Galleries such that they were moved out by January 1, 2001.

Lammert also attempted to enter into negotiations with Northwest Coffee regarding moving them to another space within the shopping center. Northwest Coffee refused to move, and plaintiff filed a lawsuit to force the move or terminate the lease. Prior to filing the lawsuit and on multiple occasions while the lawsuit was pending, Lammert contacted Feldman and provided him with updates regarding the status of the litigation. In each instance, Lammert was encouraged to keep moving ahead with the lawsuit and to ensure that the tenants were out as quickly as possible.

On or about January 22, 2001, plaintiff, defendant, and Schnuck Markets entered into and signed a document entitled "Termination of Lease and Sublease Agreement and Release" ("Termination Agreement"). The Termination Agreement provided for, among other things, a deadline of April 30, 2001, for the parties to reach an agreement on the terms of a direct lease and for all conditions precedent to any such lease to be satisfied. Under the Termination Agreement, the Lease and Sublease remained in effect in the event that the Termination Agreement expired or was terminated. Paragraph 8 of the Termination Agreement stated: "<u>Entire Agreement</u>. This is the entire, full and complete agreement between the parties regarding the termination of the Lease and Sublease and it supersedes all prior understandings, agreements, and representations of any kind or nature concerning the subject matter hereof." The Termination Agreement did not contain any promise by

defendant to reimburse plaintiff for the costs of negotiating a direct lease, terminating the Lease and Sublease, or making additional space at Lammert Center available to defendant for expansion of its store.

On February 21, 2001, Murray sent Brier a redlined version of the draft direct lease that Brier had prepared and sent in October. The changes in the revised lease involved simplification of the language used and a modification to the standard provisions that would cause the lease to be more in line with other leases utilized for Lammert Center.

On February 23, 2001, Brier sent an e-mail to Murray asking him to set up a telephone conference with the person who made the proposed changes to her draft lease so that Brier could negotiate directly with that person. Murray told Brier that most of the changes were made at the request of Lammert and that Lammert was planning to meet with Feldman the next week to work out the remaining lease issues.

On February 24, 2001, Brier sent Murray another e-mail setting forth some, but not all, of her responses to plaintiff's proposed changes to the draft lease. In that e-mail, Brier told Murray that defendant objected to many of the proposed changes because they were substantive, not merely stylistic. Brier also requested, again, a conference call to address these issues.

By the end of February 2001, Brier began to doubt the ability of the parties to enter into a mutually agreeable lease

with sufficient time for plaintiff to satisfy the conditions that defendant required be satisfied by April 30. One reason for her doubt was the length of time it took for plaintiff to respond to the October 2000 draft lease. Another reason was the revisions that plaintiff proposed when it did respond. A third reason was the way in which Lammert had approached a proposed indemnification agreement that would have required plaintiff to reimburse defendant for a portion of the architectural and engineering costs that defendant was incurring in the event that the parties could not reach agreement on the terms of a lease. On February 25, 2001, Brier sent Murray a letter reminding him that time was of the essence because of the impending opening of the new Whole Foods store and telling him that she had serious doubts that the parties could still accomplish that goal given the extensive delays on a direct lease and the indemnification agreement.

Despite Brier's growing doubts about plaintiff's ability to agree upon and sign a direct lease, defendant continued to negotiate with plaintiff because defendant still wanted to expand its store at Lammert Center and hoped that a lease could be negotiated and signed by April 30, 2001. During their negotiations, plaintiff and defendant never agreed upon the terms and conditions of a direct lease. As of March 6, 2001, plaintiff had identified 39 "major issues" that needed resolution before a lease could be agreed upon.

On or about April 16, 2001, Susan Hamilton, defendant's

lease administrator, sent a letter to Lammert proposing that the April 30 deadline in the Termination Agreement be extended to June 30, 2001. The letter was sent because, at that time, defendant still intended to expand at Lammert Center to better compete with Whole Foods.

On April 17, 2001, defendant received a fax from plaintiff advising defendant that plaintiff did not settle its litigation with Northwest Coffee. The fax indicated that the trial in that litigation would take place April 25, 2001. Plaintiff explained that, in order to meet Northwest Coffee's settlement demands, it would have to expend an additional $400,000.00. Plaintiff requested that defendant consider a change to the proposed lease that would allow the settlement to go through. The fax informed defendant that the presiding judge in the case could find certain facts that would lead to Northwest Coffee remaining in its current space until the fall of 2001. Defendant was not willing to pay the additional rent that would have allowed plaintiff's case with Northwest Coffee to settle.

On or about April 24, 2001, Brier, Feldman, and other executives of defendant met to discuss the status of the negotiations with plaintiff. During that meeting, defendant determined that plaintiff could not provide defendant with expansion space on terms acceptable to defendant in time for defendant to expand its store before the anticipated opening of the new Whole Foods store. On April 25, 2001, defendant informed

11

plaintiff that it was withdrawing its offer to extend the negotiating deadline to June 30, 2001, and ceasing negotiations because it no longer had interest in expanding. As a result, plaintiff entered into an agreement with Northwest Coffee whereby both sides dismissed their claims.

At the time their negotiations ended, plaintiff and defendant had not reached an agreement on all of the terms of a direct lease, and there was no final form or version of a direct lease that both parties agreed to sign. During lease negotiations, defendant never promised to sign a direct lease even if the parties could not reach agreement on its terms. At his deposition, Murray, counsel for plaintiff during the negotiations, testified that he believed defendant negotiated in good faith.

As a result of moving Prints Charming and Greeting Galleries, and attempting to move Northwest Coffee, plaintiff incurred significant costs, including moving expenses, rent reductions, construction costs, and legal fees. Plaintiff was also required to reduce the space occupied by Ladue Galleries, another existing tenant, in order to accommodate the new space for Prints Charming. Ladue Galleries received a rent reduction and debt forgiveness for giving up space.

## Discussion

In its instant motion, defendant moves the Court for summary judgment on Count VII, which is labeled as a claim for

12

promissory estoppel by plaintiff. Defendant asserts that: (1) plaintiff cannot identify a promise sufficient to support a promissory estoppel claim; (2) to the extent a promise to negotiate in good faith can support a promissory estoppel claim, defendant did negotiate in good faith; (3) plaintiff's reliance on defendant's alleged promise was unreasonable; and (4) plaintiff did not suffer any injustice. Plaintiff opposes defendant's motion arguing that: (1) promissory estoppel is proper to enforce a promise to negotiate in good faith; (2) defendant promised to negotiate in good faith and consummate a lease; (3) defendant acted in bad faith by hiding information and terminating negotiations; and (4) plaintiff has suffered an injustice as a result of defendant's actions.

This case is before the Court under diversity jurisdiction. Federal courts sitting in diversity apply the law, including the choice-of-law principles, of the forum state. <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941); <u>Birnstill v. Home Sav. of Am.</u>, 907 F.2d 795, 797 (8th Cir. 1990). The parties apply Missouri law in their briefs, and neither argues for the application of a different state's law. Accordingly, the Court will apply the law of Missouri, the forum state of this Court.

Under Missouri law, promissory estoppel allows courts to enforce a promise on equitable grounds, even where parties did not enter into a contract. <u>City of St. Joseph, Mo. v. Sw. Bell Tel.</u>, 439 F.3d 468, 477 (8th Cir. 2006). The doctrine of promissory

13

estoppel is to be applied "with caution, sparingly and only in extreme cases to avoid unjust results." Id. To prevail on a promissory estoppel claim under Missouri law, a party must establish the following four elements: (1) a promise; (2) on which the plaintiff relied to its detriment; (3) in a way the promisor expected or should have expected; and (4) the reliance resulted in an injustice which can be cured only by enforcement of the promise. Clevenger v. Oliver Ins. Agency, Inc., 237 S.W.3d 588, 590 (Mo. 2007) (en banc).

With regard to the first element, "[a] promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Kearney Comm'l Bank v. Popejoy, 119 S.W.3d 143, 147 (Mo. Ct. App. 1997). A promise is the promisor's expression of an intention to "bring about a specified result in the future." Id. The promise must be definite and made in a contractual sense. Id. "[A] supposed promise that is 'wholly illusory' or a mere expression of intention, hope, desire, or opinion, which shows no real commitment, cannot be expected to induce reliance." Prenger, 939 S.W.2d 23, 27 n.5 (Mo. Ct. App. 1997) (quotation omitted). In addition, under Missouri law, the promise element cannot be based on preliminary negotiations and discussions or an agreement to negotiate the terms of a future contract. See id. at 27. Finally, Missouri courts have determined that the promise element of a promissory estoppel claim requires a

showing that the promissor's later actions were inconsistent with the promise, i.e., that the promise was breached.  See id. at 27-28 (citing Resnik v. Blue Cross & Blue Shield of Mo., 912 S.W.2d 567, 573 (Mo. Ct. App. 1995)).

The Eighth Circuit Court of Appeals' rulings in Budget Marketing, Inc. v. Centronics Corp. ("Centronics I"), 927 F.2d 421 (8th Cir. 1991) and Budget Marketing, Inc. v. Centronics Corp. ("Centronics II"), 979 F.2d 1333 (8th Cir. 1992) have been briefed extensively by the parties and merit discussion by the Court. These cases involved the application of Iowa's promissory estoppel law, which, like Missouri's law, is based on the Restatement (Second) of Contracts § 90.  The facts of the case are described in Centronics I as follows.  The lawsuit involved the breakdown of negotiations for the purchase of Budget Marketing, Inc. ("BMI") by Centronics.  After initial discussions regarding the purchase, BMI and Centronics executed a non-binding letter of intent outlining the basic terms of the proposed acquisition and several conditions precedent to completing the purchase.  Following the execution of the letter of intent, BMI began taking the steps necessary to meet the conditions imposed by the letter of intent, keeping Centronics informed of its efforts.  Unbeknownst to BMI, Centronics had also been considering the acquisition of another company during its negotiations with BMI.  Centronics did not disclose that information to BMI, and in the following months, Centronics acted as if its transaction with BMI would close.  Seven months after

executing the letter of intent and after BMI had incurred substantial costs attempting to meet the conditions in the letter of intent, Centronics abruptly halted preparations for closing the deal, claiming that one of the negative conditions of the letter of intent would be triggered by the tax consequences of the purchase. Under those facts, BMI claimed that the letter of intent established a duty to negotiate in good faith, which Centronics breached. BMI also claimed that Centronics gave oral assurances that the deal outlined in the letter of intent would be consummated, giving rise to a claim for promissory estoppel. The district court granted summary judgment on all of BMI's claims. Centronics I, 927 F.2d at 423-24.

In Centronics I, the Eighth Circuit upheld the grant of summary judgment with respect to BMI's claim that Centronics breached a duty to negotiate in good faith, finding that no such duty existed because the letter of intent expressly stated that the parties were not bound to complete the purchase. Id. at 425-26. However, the Eighth Circuit reversed the grant of summary judgment with respect to the promissory estoppel claim based on Centronics' alleged oral assurances. Id. at 428. The court listed five alleged assurances that created an issue of fact as to whether a promise was made. Id. at 426 n.5. The court noted that the key facts were the non-binding letter of intent, BMI's substantial steps taken toward consummating the deal, and BMI's reliance on the assurances and actions of Centronics. Id. at 428. The court

16

reasoned that evidence of Centronics' oral assurances that it would close the deal, coupled with BMI's reliance and Centronics' awareness of BMI's reliance, was "substantial enough to establish a trible claim." Id. at 427. The court concluded that "BMI has established a trible claim of promissory estoppel that would support an award of reliance damages." Id. at 428.

On remand, the case was submitted to a jury, which awarded damages in excess of $100,000.00. Centronics II, 979 F.2d at 1334. After trial, the district court entered judgment for Centronics, notwithstanding the verdict, because, as a matter of law, all of the expenditures allegedly incurred by BMI in reliance on Centronics' assurances were unreasonable. Id. In Centronics II, the Eighth Circuit affirmed the district court's judgment in favor of Centronics. Id. at 1335. The court noted that Centronics I held that BMI could recover by showing substantial expenditures in reasonable reliance on oral assurances by Centronics that the deal would be consummated. Id. at 1334. The court explained that the five assurances listed in Centronics I were all made after the execution of the letter of intent (which disclaimed the creation of a legal obligation to consummate the merger). The court further explained that the summary judgment was reversed in Centronics I because those five assurances could reasonably have been taken to supersede the disclaimer provisions of the letter of intent, and expenditures in reliance on them would then be reasonable. Id. The jury, however, answered a special interrogatory indicating that

the only assurance given by Centronics occurred before the letter of intent was signed. Id. The court held that, as a matter of law, BMI could not continue to rely on an informal assurance after the letter of intent was signed. Id.

In Centronics II, the Eighth Circuit determined that, under the facts of Centronics II and Iowa law, an oral assurance could supercede the disclaimer provision of a non-binding letter of intent, making the letter of intent binding, such that BMI could have recovered its reliance damages under a promissory estoppel theory. Id. Therefore, Centronics I and Centronics II provide persuasive authority for the proposition that oral assurances that parties would enter into a future contract are potentially actionable to the extent they supercede language in a previously executed letter of intent disclaiming a binding agreement. This holding may conflict with Missouri law, see Halls Ferry Invs., Inc. v. Smith, 985 S.W.2d 848, 853 (Mo. Ct. App. 1998) (holding that "[p]romissory estoppel cannot be used to engraft a promise" onto a contract that is different from the written terms), but the Court will assume, for the sake of argument, that Missouri courts would agree with Centronics, distinguishing a letter of intent from an actual contract. To the extent Centronics II suggests in dicta that oral assurances that a future contract will be executed,

standing alone, are actionable,[1] the <u>Centronics</u> cases are inconsistent and irreconcilable with Missouri law, which definitively states that promises to enter into future contracts are not actionable. <u>See</u> <u>Prenger</u>, 939 S.W.2d at 27.

In the present case, Feldman's oral assurances to Lammert that defendant would enter into a new lease were made before the parties had agreed to a non-binding letter of intent. At the time Feldman made the statements (August and September 2000), the parties had only exchanged several proposed letters of intent, but none of those proposals were executed. As such, Feldman's statements were not the type of oral assurances contemplated in the <u>Centronics</u> cases that would give rise to a claim of promissory estoppel because they did not supercede disclaimer language in a non-binding letter of intent. Instead, Feldman's statements can only be considered promises to negotiate the terms of a future contract, which, as a matter of Missouri law, are not actionable. <u>Id.</u> Accordingly, the Court must grant summary judgment in favor of defendant on plaintiff's promissory estoppel claims arising out of

---

[1] The Court refers to the following passage in <u>Centronics II</u>: "Assuming that there was such a definite agreement or assurance in February, or even in April, expenses incurred in reliance on it would be recoverable on a promissory-estoppel theory, but only if no event intervened making such expenditures unreasonable." 979 F.2d at 1334. The court did not elaborate on what it meant by "a definite agreement or assurance," but this passage of dicta could be read to suggest that an oral assurance that a party would enter into a future contract would be actionable. <u>Centronics II</u>, however, has never been cited by another court for that proposition, and as noted above, that proposition is in conflict with Missouri law.

Feldman's oral assurances made before the parties entered into a written agreement. This grant of summary judgment includes the alleged damages incurred in the moving of Prints Charming and Greeting Galleries.

The Court next turns to the Termination Agreement to determine whether that writing constituted an actionable promise. The Termination Agreement, which would have terminated the Lease and Sublease, was not a letter of intent, as the parties signed in Centronics. The letter of intent in Centronics contained the basic terms of the agreement and several conditions that would prevent the transaction from closing. The Termination Agreement, on the other hand, did not set forth any of the terms of a new lease. Instead, it merely indicated that, if the parties reached an agreement on a new lease, the existing Lease and Sublease would terminate. It further stated that failure to execute a new lease would not constitute a breach of the agreement. Thus, the Termination Agreement was expressly conditioned on the parties reaching agreement on the terms of a new lease. Given these provisions, the Termination Agreement is nothing more than a non-actionable agreement to negotiate the terms of a future contract. 168th & Dodge, LP v. Rave Reviews Cinemas, LLC, 501 F.3d 945, 956-57 (8th Cir. 2007) (upholding summary judgment under Nebraska law because "promissory estoppel cannot be based on the parties' agreement to negotiate the terms of the lease agreement"); Prenger 939 S.W.2d at 27 (upholding summary judgment because a letter

20

agreeing to negotiate a future contract does not amount to a promise under promissory estoppel). Accordingly, like Feldman's oral assurances, the Termination Agreement, by itself, does not support the promise element of plaintiff's promissory estoppel claim, and the Court will grant summary judgment in defendant's favor to the extent plaintiff's promissory estoppel claim is based on the language of the Termination Agreement.

With regard to defendant's oral assurances made after the parties entered into the Termination Agreement on January 22, 2001, plaintiff states that Lammert provided Feldman with updates regarding the litigation with Northwest Coffee, and each time "was encouraged to keep moving ahead with the lawsuit and to ensure that the tenants were out as quickly as possible." Doc. #40, p. 16. These communications were not definite promises made in a contractual sense. Furthermore, they cannot be said to supersede the express conditional language of the Termination Agreement. As stated above, unlike the letter of intent in the Centronics cases, which set out the basic terms of the parties' agreement but disclaimed a binding contract, the Termination Agreement did not provide any of the terms of the future lease the parties intended to execute. Feldman's oral assurance following the execution of the Termination Agreement did not make a binding letter of intent or a definite promise out of what was only an agreement to negotiate a future contract. Thus, the Court will grant summary judgment on plaintiff's promissory estoppel claim to the extent it

is based on Feldman's statements made after the execution of the Termination Agreement.

Assuming, for the sake of argument, that defendant's promises were actionable, the Court next turns to the issue of whether defendant breached its promises. Plaintiff claims that defendant breached its promises by failing to negotiate in good faith. Under Missouri law, when performance of a promise is conditioned on the satisfaction of the promisor, the promisor must exercise that judgment in good faith, which means that he cannot act arbitrarily or capriciously and there must be a bona fide reason for his dissatisfaction. Long v. Huffman, 557 S.W.2d 911, 916 (Mo. Ct. App. 1977).

At the outset of the negotiations, defendant advised plaintiff that time was of the essence because defendant wanted to finish its proposed expansion prior to the fall of 2001. Negotiations began in July and continued in August and September 2000, and the parties agreed to some, but not all, of the terms of the new lease. In September 2000, defendant sent plaintiff a proposed lease that included the terms the parties had agreed on and defendant's position on the disputed terms. Defendant, hearing no response from plaintiff, re-sent the draft lease in October 2000. Despite not receiving a response on its proposed lease, defendant entered into the Termination Agreement in January 2001, which was set to expire at the end of that April. Near the end of February, plaintiff responded to defendant's proposed lease,

sending a redlined version of defendant's draft with plaintiff's proposed changes. Over the next several days, defendant repeatedly expressed to plaintiff its displeasure with the nature of the changes and its doubts that the parties would be able to reach agreement by the end of April.[2] Defendant also reminded plaintiff that time was of the essence because of the impending opening of the Whole Foods store. On March 6, 2001, plaintiff identified 39 "major issues" that needed to be resolved. Still desiring to enter into the new lease, defendant proposed an extension of the termination agreement on April 16, 2001. The following day, plaintiff notified defendant of its difficulty moving Northwest Coffee. Plaintiff presented defendant with two scenarios: (1) plaintiff could settle the litigation with Northwest Coffee if defendant agreed to a $216,000.00 increase in rent, and Northwest Coffee would vacate its space immediately; or (2) plaintiff could continue to trial with Northwest Coffee, with plaintiff's attorneys predicting the likely outcome being that the judge would rule against plaintiff, causing Northwest Coffee to remain in its space until September or October of 2001. Only when faced with the possibility of paying substantially larger rent or the likelihood of not completing the expansion until after the new Whole Foods store opened did defendant withdraw from negotiations, just five

---

[2] Plaintiff's argument that defendant hid these doubts is not supported by the record and is not a reasonable inference that can be drawn from the undisputed facts.

days before the Termination Agreement was to expire. In doing so, defendant gave plaintiff the opportunity to avoid going to trial with Northwest Coffee, and, indeed, plaintiff was able to settle its case with Northwest Coffee.

Under those facts, plaintiff does not present any evidence that defendant acted arbitrarily, capriciously, or without a bona fide reason for not entering into the new lease. Plaintiff does not present any evidence that defendant attempted to leverage plaintiff's relocation expenses to extort a lower rent. Nor does plaintiff present any evidence that defendant was negotiating with another shopping center at the same time as it was negotiating with plaintiff. Furthermore, while the Court does not treat it as a binding admission on plaintiff, plaintiff's attorney, who represented plaintiff during the negotiations, admitted in his deposition that he believed defendant negotiated in good faith. Doc. #33-12, pp. 7-9. In sum, plaintiff has not presented any evidence that suggests defendant acted in bad faith, and bad faith is not a reasonable inference that the Court can draw from the evidence. Thus, to the extent defendant's promises are actionable, the Court would grant summary judgment because plaintiff has not presented any evidence that defendant acted inconsistently with its promises.

With regard to the reasonable reliance element of plaintiff's promissory estoppel claim, the Court's decision to grant summary judgment is bolstered by the fact that, even if

defendant's promises were actionable and breached, it was unreasonable as a matter of law for a sophisticated landlord to rely on such promises from a tenant. "[T]his is not a situation of an individual taken advantage of by a corporation or an individual with superior knowledge of legal and business practices." <u>Gruen Indus., Inc. v. Biller</u>, 608 F.2d 274, 281 (7th Cir. 1979). The record shows that plaintiff had been negotiating leases for Lammert Center since at least 1992 and had negotiated at least five commercial leases during that time. In addition to its own experience, plaintiff was represented by counsel during its negotiations with defendant. Furthermore, in Lammert's August 24, 2000, letter to defendant, regarding plaintiff's efforts to obtain financing for the expenses required to relocate the other tenants, Lammert wrote that both lenders he contacted would require "an executed Letter Of Intent or the executed New Lease (with contingencies) before formally taking my request to their loan committees." Doc. #33-11, p. 2. He also wrote that "[e]ither an executed Letter of Intent or New Lease will also be needed for the informal discussions my father and I will be having with the City of Ladue." <u>Id.</u> With these statements, it is clear that plaintiff was aware of the importance of having an enforceable agreement with defendant before moving forward with plans to move the other tenants. Yet, despite that knowledge, plaintiff chose to move forward with relocating the other tenants without reaching an agreement with defendant. In incurring the relocation expenses

25

without securing a new lease, a letter of intent, or indemnification, plaintiff could not have reasonably relied on any promise by defendant to enter into a lease agreement, given the possibility that the parties would be unable to reach an agreement on all of the terms of a new lease. See 168th & Dodge, 501 F.3d at 957; Andersons, Inc. v. Consol, Inc., 348 F.3d 496, 505 (6th Cir. 2003); Doll v. Grand Union Co., 925 F.2d 1363, 1373 (11th Cir. 1991). Thus, to the extent defendant's promises were actionable and breached, the Court would grant summary judgment because plaintiff's reliance on such promises was unreasonable under the circumstances.

Finally, with regard to the principle of Missouri law that promissory estoppel is disfavored and should only be applied in extreme cases to remedy an injustice, this case is not extreme and does not present an injustice. Two sophisticated business entities represented by attorneys attempted to enter into a new lease agreement. Despite extensive efforts, the parties could not agree on a new lease. Plaintiff's difficulty moving Northwest Coffee and the parties' inability to reach agreement on all of the terms of a new lease were unforeseen events at the time defendant promised to enter into a new lease. The question is who should be responsible for bearing the burden caused by these unforeseen events. Id. Both parties incurred transaction costs during that process, but neither party agreed to indemnify the other for costs incurred. "When the parties have apportioned the risk [of a failed

negotiation] among themselves, a court should be hesitant to step in and contravene their explicit agreement." <u>Id.</u> Here, the Court does not believe justice would be served by forcing defendant to bear the entire burden of this failed negotiation and is content to let each party bear its own burden.

### Conclusion

For the above stated reasons,

**IT IS HEREBY ORDERED** that defendant's motion for partial summary judgment directed to Count VII of plaintiff's complaint [Doc. #31] is granted.

Dated this __26th__ day of July, 2010.

/s/Donald J. Stohr
UNITED STATES DISTRICT JUDGE